# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DISTRICT

| | | |
|---|---|---|
| IRA BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 05 C 4594 |
| | ) | Magistrate Judge Schenkier |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this Social Security Appeal, the claimant, Ira Bailey ("plaintiff"), seeks reversal and/or remand of the Commissioner's denial of her claim for Disability Insurance (Title II) Benefits ("DIB") and for Supplemental Security Income ("SSI") payments for an alleged disability prior to her 55th birthday on August 2, 2002. Plaintiff received a favorable determination awarding her Title II benefits from the Commissioner as of her 55th birthday. Thus, the issue on appeal is limited to the issue of whether plaintiff is entitled to an earlier onset date for disability, specifically October 20, 1999, which would entitle her to Title II disability benefits from that date up to August 2, 2002 – the date she began receiving Title II benefits from the Social Security Administration.[2] For the reasons that follow, the Commissioner's motion for summary judgment (doc. # 23) is denied and the

---

[1] On February 16, 2006, the Executive Committee transferred this case to this Court for all proceedings including the entry of final judgment pursuant to full consent of the parties and 28 U.S.C. § 636(c) (doc. # 17).

[2] At the February 22, 2005 hearing, the ALJ told the plaintiff that she was not eligible for SSI because she had too much income and other resources (R. 42-43). That statement is not challenged by the plaintiff.

plaintiff's motion for summary judgment (doc. # 26) is granted. The Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

I.

This case has a long procedural history. The ALJ clearly addressed this history in her decision, so we will simply review the main points here. The plaintiff's initial claim for benefits was filed in the Social Security Administration on January 5, 2000 (R.12). In that claim, plaintiff alleged an onset date of October 20, 1999, based on achilles tendon, heart problems, and a stroke (R. 317).

This claim was denied initially and on reconsideration (R. 166, 173). It was also denied on September 25, 2001, after a hearing held on September 11, 2001, by Administrative Law Judge ("ALJ") Cynthia Bretthauer, who found that plaintiff had the residual functional capacity to perform a wide range of light exertional work (R. 206).[3] On March 29, 2002, the Appeals Council ("AC") remanded the claim to ALJ Bretthauer to reconsider the denial in light of claimant's allegation of severe depression (R. 241). On September 24, 2002, ALJ Bretthauer issued a partially favorable decision, finding that claimant still had the residual functional capacity to perform work at the light exertional level, but by operation of the medical vocational guidelines, she was disabled as of August 2, 2002, the date she turned 55 years old. Judge Bretthauer therefore granted plaintiff benefits as of August 2, 2002, but not prior thereto. Plaintiff appealed this second determination as to the issue of onset date only. The AC denied this claim on January 30, 2004, making that denial the final decision of the Commissioner (R. 155). The plaintiff filed an appeal in this Court on March 26, 2004 (R. 155). The Commissioner lost the tape of the administrative hearing and filed an

---

[3]We note that the plaintiff also alleged disability based on mood disorder as part of her oral testimony before ALJ Bretthauer (R. 14).

2

unopposed motion for remand (R. 157, 161). ALJ Helen Cropper held a supplemental hearing on February 22, 2005, and, on May 24, 2005, issued an unfavorable decision for the time period prior to August 2, 2002 (R. 28). The plaintiff now appeals to this Court.

## II.

The record shows that the ALJ considered the three factors identified by Social Security Ruling ("SSR") 83-20 (non-traumatic disabilities) in making the determination that plaintiff's onset date did not begin prior to August 2, 2002. Those three factors were: (1) the allegations regarding onset of disability; (2) the claimant's work history; and (3) the medical evidence. We review, in turn, the evidence regarding each factor.

### A.

On October 20, 1999, plaintiff suffered an acute cerebrovascular accident, confirmed by a CT scan of the brain on October 21, 1999 (R. 523, 525). Plaintiff went to the emergency room at St. Francis Hospital of Evanston reporting symptoms indicating a stroke (*i.e.,* slurred speech, slightly decreased hand grip, and slightly decreased strength in the right leg) ® 525-529). The record shows plaintiff also appeared disoriented: at first she thought it was 1996 (it was 1999); she could not identify the President of the United States at that time; and the emergency room doctor noted that she "had occasional episodes of expressive aphasia in the ER and loss of short-term memory" (R.

525-530). Dr. Fitzgerald, her treating physician, diagnosed cerebrovascular accident, right hemiparesis,[4] and aphasia[5] (*Id.*).

## B.

Plaintiff has a high-school diploma (R. 49). Thereafter, plaintiff worked as a bus driver for the Chicago Transit Authority ("CTA") from June 17, 1975 until October 21, 1999 (R. 313-316). After her stroke, plaintiff received short-term disability ("STD") payments from the CTA for 26 weeks. She retired from the CTA in April, 2000, after the STD benefits were exhausted, because she had completed nearly 25 years of service with the CTA and was eligible for full retirement benefits (R. 47, 61).

In 1992, while she was a bus driver, plaintiff attended college-level classes and earned a counseling degree in May 1992 (R. 48-49). Shortly after receiving this degree, plaintiff was hired as a part-time employee of Amalgamated Transit Workers Union (R. 52). She worked there for approximately three years on a 20 hour per week schedule, where she performed counseling work in the union office, typically speaking by telephone to union members about their substance problems or the problems of their family members. She gave advice, information and referrals, as needed. Plaintiff held this job during the day while she drove a bus full-time at night (R. 54-56).

The plaintiff has maintained her commercial driver's license since she retired from the CTA, but she has not used it to work. She also testified that she has not driven an automobile regularly

---

[4]Hemiparesis is "weakness on one side of the body. Hemiparesis . . . commonly occurs as a result of a stroke. A person who has a stroke in the left hemisphere of the brain may exhibit right-side paresis or paralysis. . . ." AMERICAN MEDICAL ASSOC., COMPLETE MEDICAL ENCYCLOPEDIA ("ENCYCLOPEDIA") at 650 Gerrold B. Liekin, M.D. and Martin S. Lipsky, M.D. eds., 1st ed. 2003).

[5]Aphasia is defined as "language problems caused by injury to the brain. People with aphasia have problems with speaking, understanding, reading, or writing." ENCYCLOPEDIA at 186.

4

since her stroke, but she does drive short distances at times (R. 15). She has also done occasional volunteer work since she retired from the CTA (*Id.*; R. 62). Since October 21, 1999, plaintiff has not engaged in any full-time employment, or any other work activity that would disqualify her from eligibility for benefits.

## C.

Plaintiff's allegations that she is disabled due to "achilles tendon, heart, and stroke" are based on the following medical evidence. The plaintiff had a heart attack in 1992, at the age of 44. She was treated at St. Francis Hospital in Blue Island, Illinois (R. 388-429). In November 1994, plaintiff ruptured her left Achilles tendon at work (R. 372-387). During early 1995, she had physical therapy at St. Francis Hospital of Evanston, Illinois, to repair this tendon (R. 430-441). However, as plaintiff's work history demonstrates, she returned to full-time work after each of these medical events.

After her stroke in October 1999, the plaintiff saw several primary care physicians at North Shore Medical Group (R. 519-521). On October 21, 1999, Dr. Fitzgerald, the first doctor plaintiff saw after the stroke, noted that she had mild aphasia and mild right hemiparesis (weakness of the upper and lower extremities on the right) (*Id.*). He advised plaintiff to take an aspirin everyday (*Id.*). He did not refer plaintiff for physical, occupational or speech therapy (*Id.*). On October 29, 1999, Dr. Fitzgerald reported improvement in plaintiff's use of her right hand, but continuing difficulty with speech (*Id.*). On November 12, 1999, Dr. Fitzgerald reported that plaintiff's speech was "much better" but that she was still "clumsy" when using her right arm (*Id.*). On November 22, 1999, plaintiff called Dr. Fitzgerald to report feelings of numbness in her right side (R. 482). On November 29, 1999, Dr. Fitzgerald examined plaintiff, who also complained of decreased short-term

5

memory and intermittent feelings of numbness in her right arm (*Id.*). She reported that she was able to print but not write. Dr. Fitzgerald noted improved speech, but he referred plaintiff for speech therapy (*Id.*).

Plaintiff's insurance records show that she completed a formal speech evaluation and six speech therapy visits between November 17 and December 16, 1999 (R. 551-552), but there are no hospital records or progress notes from this therapy in the record. On December 20, 1999, plaintiff reported to Dr. Fitzgerald that she had finished speech therapy, but still had trouble with handwriting and spelling (R. 485). However, plaintiff testified that when she applied for disability benefits on December 22, 1999 (R. 317-326) and completed a vocational report on January 14, 2000 (R. 331-338), she was able to complete the entries on the disability report by using her non-dominant left hand (R. 49). Moreover, at her next visit with Dr. Fitzgerald, she reported that her handwriting and speech were both improved, and Dr. Fitzgerald described her speech as "quite good now" (R. 485).

The plaintiff had a consultative examination by Dr. Dean Velis on February 7, 2000 (R. 442-446). Dr. Velis described weakness of plaintiff's right upper extremity, with continued difficulty using her right arm and hand, and expressive aphasia, which Dr. Velis reported was improving (R. 445). Dr. Velis also reported that plaintiff exhibited an occasional mild limp (R. 443). On examination, Dr. Velis reported that plaintiff had reduced uncorrected and pinhole corrected visual acuity and slightly reduced subjective grip strength of the right hand, assessed as 4/5 (R. 444). Dr. Velis described plaintiff as being able to use her dominant right hand to manipulate "but with less intensity and strength than with the left-hand" (R. 445). He noted that using her right hand, claimant was able "to pick up coins, button her shirt and pull up a zipper" (*Id.*, at 442). Dr. Velis also reported that claimant had mild to moderate expressive aphasia, but the rest of the neurologic findings were

normal, as was claimant's mini-mental status examination (*Id.*). In March 2000, Dr. Velis provided additional information about claimant's aphasia. He reported that claimant had difficulty completing a sentence, and that she answered about half of his questions with a one syllable response (*Id.*).

On April 24, 2000, the plaintiff saw Dr. Fitzgerald for the last time that year (due to Dr. Fitzgerald's need to undergo personal surgery). At this visit, she reported that she was feeling okay, and Dr. Fitzgerald wrote that there were no further CNS (central nervous systems) problems at that time. Dr. Fitzgerald advised her to continue taking an aspirin every day, in addition to Plavix to treat her coronary artery disease (R. 460).

On April 25, 2000, the plaintiff was also examined by a psychiatrist, Dr. John O'Donnell (R. 448-454). Dr. O'Donnell noted that plaintiff was nicely dressed and groomed, and cooperative (*Id.*, at 448). Plaintiff complained of difficulty finding words when speaking, and that had been depressed since the stroke because her activities had been significantly limited (*Id.*, at 449). She reported no current prescribed medications (*Id.*). At that time, she also reported living in an apartment with her 20-year-old son and her 29-year-old nephew, who did most of the shopping and housework (*Id.*, at 450).

Dr. O'Donnell's mental status examination revealed normal findings (R. 451). He described plaintiff's speech at the outset of the examination as "hesitant and faltering" and noted that she appeared to be searching for words, but he reported that, as the exam progressed, plaintiff's "speech improved, was less faltering or hesitant and that the stream of conversation varied from short responses of one to four words to free-flowing and relevant (*Id.*). Dr. O'Donnell noted that plaintiff was "sometimes" slow to respond to his questions, but her immediate, recent and remote memory

were assessed as normal (*Id.*, at 451-52). However, Dr. O'Donnell diagnosed vascular dementia, of unspecified severity, with depressed mood (*Id.*, at 453).

Shortly before plaintiff elected to retire, the CTA sent her for an independent medical evaluation. This evaluation was done on June 5, 2000, by Dr. John Sarantopoulos, an osteopath and specialist in physical medicine and rehabilitation (R. 533-534). Dr. Sarantopoulos described plaintiff as having intact comprehension, but difficulty with repeating some phrases and fluency in speech. He also described minor abnormalities on the neurological exam: claimant's right-sided reflexes were brisker than those on the left, she had a trace of clonus at the right ankle and a positive right Babinski sign.[6] Her gait was normal. She had decreased right-sided upper and lower extremity strength, of unspecified degree, as compared to the left side. Dr. Sarantopoulos requested additional information to permit him to assess claimant's ability to return to work as a bus driver. He was not asked to evaluate whether plaintiff could perform other work at the CTA or elsewhere.

The plaintiff returned to North Shore for a follow-up on June 19, 2000, where she saw Dr. O'Sullivan (rather than Dr. Fitzgerald). At this examination, she complained of problems with "speech, calculation, control of emotions," and of occasional headaches (R. 459). The plaintiff's blood pressure was elevated and Dr. O'Sullivan advised her to resume taking anti-hypertension medication (*Id.*). The doctor completed a credit disability insurance claim form at plaintiff's request (*Id.*). The plaintiff's next visit to Dr. O'Sullivan was on July 17, 2000. At this time, plaintiff's blood pressure was slightly better and she reported that she was doing well overall, but still had some

---

[6]Ankle clonus is an abnormal reflex induced by sudden flexion of the foot that causes rapid alternating contraction and relaxation of the muscle. The Babinski sign in hemiparesis is positive when muscle contraction is slower on the affected side than the opposite side. Hemiparesis is muscular weakness or partial paralysis affecting one side of the body. DORLAND'S MEDICAL DICTIONARY, 28th edition.

problems with speech, calculation and control of emotions. Dr. Sullivan advised her to continue taking the same medications (R. 460).

On August 29, 2000, the plaintiff saw Dr. O'Sullivan for treatment of respiratory infection. Her blood pressure was elevated, but she told the doctor she had not taken her blood pressure medicine that day (R. 484). Dr. O'Sullivan prescribed antibiotics for diagnosed bronchitis. The plaintiff returned for a follow-up on September 11, 2000. She reported that she was doing better; and, the doctor advised her to stop smoking (R. 484).

Plaintiff did not feel better for long, however, because on November 15, 2000, she went to the emergency room at St. Francis Hospital in Evanston, complaining of chest pain. She was given nitroglycerin which resolved her pain (R. 492). Upon examination, she was shown to have abnormal sounds in both lungs, and her motor strength of the right upper and lower extremity were decreased as compared to the left, although she had normal muscle tone throughout. The neurological exam was considered by the emergency room doctor, overall, to be intact. Claimant was admitted to rule out a heart attack (R. 492-500). However, the cardiac stress test was interpreted as "unremarkable" (R. 517), and an echocaridogram was in the normal range (R. 511). A heart attack was ruled out, and claimant was discharged the following day with instructions to continue routine medications and follow-up with her doctor the following week (R. 512, 514-515).

The plaintiff did not follow up with Dr. O'Sullivan. In fact, she did not have a documented visit at North Shore until March 21, 2001, about five months after the hospital discharge, when she complained of a gynecological, not cardiac, problem, as well as continued difficulties with speech. She was given a prescription for the gynecological problem (R. 483).

9

The plaintiff's next documented treatment appears to be October 22, 2001, about one month after Judge Bretthauer issued his unfavorable decision.[7] The handwritten progress notes appear to have been made by Dr. Fitzgerald, because the handwriting is the same. At that visit, plaintiff indicated that she felt better and her speech continued to improve, but she still had weakness in her right arm and leg and had occasional headaches (R. 521). Dr. Fitzgerald prescribed a course of physical therapy ("PT"), but St. Francis had no record of PT visits. However, the plaintiff submitted insurance records to the SSA, post-hearing, to show that she had PT on four occasions: October 23, October 25, October 29, and October 31, 2001 (R. 545-550).

On January 21, 2002, the plaintiff again saw Dr. Fitzgerald. Plaintiff reported doing well overall and with her speech, but she said she had insomnia and difficulty using her hands to do things, such as opening jars (R. 520). On May 20, 2002, plaintiff saw Dr. Fitzgerald and reported having the same symptoms. In particular, she reported trouble using the computer, and that her speech was less fluent. She also reported that she had tried to go fishing but had difficulty casting with her right arm. She also reported that she had moved to the south side of Chicago and would not be using the North Shore clinic any longer (*Id.*).

After she moved to the south side of Chicago, plaintiff was treated by Dr. Chen on nine or ten different occasions because she had a series of falls (R. 83). However, the only records submitted by plaintiff related to Dr. Chen are two prescriptions she filled for Celebrex during September 2002 (R. 19).

---

[7]The ALJ noted in her decision that North Shore progress notes indicated that plaintiff was examined and treated between March and October 2001, but plaintiff's counsel was asked to provide information about that treatment and he did not do so. The ALJ also noted that Dr. Fitzgerald completed an RFC form supplied by plaintiff's counsel in July 2001 (R. 490), as discussed *infra*.

## III.

In addition to the foregoing medical records, the record in this case contains the following medical assessments of plaintiff's ability to work. We review these statements in chronological order.

On February 28, 2000, Dr. Fitzgerald completed forms to support plaintiff's CTA disability pension. He reported that she could not perform her job as a bus driver due to slowed reaction time and right-sided weakness. He noted that post-stroke therapy had included four weeks of speech therapy, but plaintiff continued to have right-sided weakness and aphasia (R. 244). He did not offer an opinion on whether or when plaintiff could return to work as a bus driver or whether she could perform other work (*Id.* at 244-45).

On June 22, 2000, Dr. O'Sullivan completed a credit disability claim insurance form – a benefit plaintiff had with CTA at the time of her stroke (R. 455-456) (signing form for Dr. Fitzgerald with his signature). Dr. O'Sullivan reported that plaintiff had difficulty with speech, calculations and controlling her emotions (based on plaintiff's complaints during her examination on June 19, 2000) (*Id.*, at 456). He opined that she was not expected to be able to return to work in the near future (*Id.*, at 455).

In May and August, 2000, two doctors reviewed claimant's record at the request of the Illinois Disability Determination (DDS) Service and opined in May and August, 2000, that plaintiff could perform close to the full range of work at the medium exertional level. They opined that she could lift, carry, push and/or pull up to 50 pounds occasionally and up to 25 pounds frequently, and that she could sit, stand and/or walk throughout a normal workday, with typical breaks. They advised that she should only occasionally climb, and noted that she had reduced distance vision, and

decreased ability to speak. They opined that she should not work at unprotected heights or around unguarded hazardous equipment (R. 461).

Also in May and August 2000, two different DDS doctors, a psychologist and a psychiatrist opined in May and August, 2000, respectively, that claimant did not suffer listing-level mental impairments (R. 469). They opined that her ability to perform daily activities was moderately limited, and that she often had deficiencies of concentration, persistence or pace, but that she had only slight difficulty maintaining social function and only one or two documented episodes of decompensation. The same doctors completed a mental RFC opinion form in which they checked boxes indicating that plaintiff was moderately limited in the ability to perform activities within a schedule and be punctual, and in the ability to respond appropriately to changes in the work setting, but was not otherwise significantly limited by mental or emotional impairments (R. 478). Overall, they opined that plaintiff was capable of performing and sustaining "simple, routine tasks" despite any residual limitations from her stroke (R. 478).

Finally, on July 10, 2001, Dr. Fitzgerald completed an impairment form, supplied by plaintiff's counsel (R. 490-92). Dr. Fitzgerald opined that plaintiff could lift, carry, push and/or pull less than 10 pounds; that she could stand and/or walk for a total of less than two hours in a workday, and could sit for "about six hours" with rest. He also opined that plaintiff could only slowly climb ramps and stairs and should not climb ladders or stoop down. He further opined that plaintiff's ability to balance on moving or unstable surfaces was only fair. He advised that plaintiff should not be exposed to unprotected heights or unguarded hazardous equipment. Finally, he described plaintiff's right hand and arm as "grossly impaired" and noted that claimant's speech was limited by aphasia, which was "improved but still obvious" (R. 491).

12

The administrative hearing transcript relevant to this appeal is dated February 22, 2005. At the 2005 hearing, plaintiff's testimony was as follows. Immediately after the stroke, and through the summer of 2000, the plaintiff's "life at home," as the ALJ put it, "was extremely difficult" (R. 22). The hearing testimony is extensive on this matter. The ALJ accurately summarized the gist of that testimony: plaintiff had difficulty walking and sometimes ran into the wall; within one month of her stroke, her son moved in with her because she could not be left alone during the day; her children typically took her to appointments and helped her even with daily activities; by the summer of 2000, her right hand grip strength and her right leg strength had both improved, but she continued to have difficulty gripping things tightly with her right hand (*e.g.*, opening a jar) and often dropped food or burned herself trying to cook; she currently still has very little ability to use her right hand and arm; and she has been essentially unable to write with her right hand since the stroke, so she has had to start using her non-dominant left hand more. Plaintiff's quality of sleep has also been poor since her stroke: she only gets three or four hours of sleep per night and she never feels rested (although she does not take naps) (*Id.*).

Plaintiff also testified that, after the stroke, she felt depressed and had bouts of crying and feeling frustrated because she could no longer do the same kinds of things she previously had been able to do (R. 107). However, she neither sought nor was referred for therapy, nor was medication ever prescribed for these symptoms. The plaintiff did attend speech therapy after her stroke, and with this therapy, her speech and her mood improved to the extent that she "stopped being depressed" (R. 22).

13

Since her stroke, thinking has also been very difficult for the plaintiff. Plaintiff "testified that her remote memory is better than her immediate memory, and that her thoughts get 'jumbled up' and it is hard for her to tell people what they need to do." (R. 22). For example, once when she was cooking, she went to the other room to watch television, but she forgot she was cooking and burned the food (R. 109). She also recounted that she once forgot which spice went into a certain recipe and she felt she should have known that (R. 22; 64).

In 2001, plaintiff testified that she began falling down (R. 83). Although she was never treated for injuries as a result of these falls, Dr. Fitzgerald advised her to use a cane, which she said she sometimes does (although she did not bring one to the hearing) (R. 22).

Plaintiff testified that her current daily activities include: watching television and movies most of the day; playing dominoes over the internet and a word game on the computer. She also attends a Bible study class once a week for about an hour, and participates actively in an "old ladies group" once a month which is held on a rotating basis in each members' home. She also gambles with her daughter at the Casino boats (R. 23; 92-98).

The plaintiff also testified that she smokes and has been unable to quit; that she does exercises at home, and can lift about six or seven pounds without problems (R. 104-05). She can stand in place but she puts more weight on her left leg, and she can only walk about one block at a time (R. 103). Plaintiff indicated that her gait has never been the same since her stroke and she shuffles her right foot, which contributes to her frequent falls (R. 102). She said, however, that she has no trouble with bending and her balance is normal (R. 104).

14

## V.

A vocational expert ("VE"), Mr. Dunleavy, also testified at the plaintiff's administrative hearing. The VE offered the opinion that plaintiff's past relevant work as a bus driver was light and semi-skilled and that her work as a substance addiction counselor was sedentary and skilled (R.116). With respect to the counseling position, the VE testified that plaintiff acquired skills that were transferable to sedentary semi-skilled occupations such as receptionist or customer service (*i.e.*, complaint and/or information clerk), with very little training and no additional education (R. 117-18).

The ALJ asked the VE several hypotheticals to determine plaintiff's residual functional capacity ("RFC") during the relevant time period (*i.e.*, between 50 and 55 years of age). The first hypothetical posed was for a woman between 50 and 55 years of age, with a high school education; who, after 1990, completed a college certificate program to be an addiction counselor; who had past work as a bus driver and an addiction counselor; and who is right-hand dominant (R. 118-119). The ALJ stated that the VE should assume an RFC to perform the full range of work at the light exertional level with limitations: inability to do constant repetitive pushing or pulling against resistence with the right upper or lower extremity; inability to climb ladders, ropes or scaffolds or work on moving or unstable surfaces; can occasionally climb ramps or stairs, occasionally stoop, kneel, crouch or crawl, and should not be exposed to unprotected heights or hazardous machinery (R. 119). Based on this hypothetical, the VE identified jobs that the plaintiff could perform such as her former counselor position, as well as receptionist (which are in the semi-skilled light as well as sedentary category) and then some unskilled light positions such as housekeepers, machine feeders and fillers, and foot messengers (*Id.*).

15

The second hypothetical given to the VE assumed that the plaintiff was limited to sedentary light work (R. 119-20). The VE stated again that the plaintiff could perform receptionist and customer service jobs, as well as information clerk jobs, even when adding the further limitation of having a reduced ability to grasp with the dominant right hand (R. 120).

With regard to both hypotheticals, the ALJ asked the VE to specify the level of employer tolerance for time off task that was not productive, outside break time, due to fatigue, pain, depression or other distractions (R. 120). The VE gave the opinion that five to six-minutes per hour or seven to eight percent of all task time would be tolerated (R. 121). The VE further testified that if the person were continually off task (using the Department of Labor and Transportation ("DOT") definition of "continual" as one-half to two-thirds of the day), despite repeated warnings, they would be terminated (R. 121). The VE did not give a concrete answer to the question of whether a person who was only occasionally off task (up to 1/3 of each day) would be terminated (R. 122).

On cross-examination by plaintiff's attorney, the VE testified that, with respect to the receptionist jobs at the light and sedentary levels, the plaintiff would also need to have the skill to do minimal keyboard work on a computer (R. 121-22). The VE said "the claimant impressed me as having that capability" (R. 123). The VE also testified that if plaintiff was unable to show up to work on a regular basis on time and report back from breaks in a reasonable time, then they would be incapable of being employable (R. 123-24).

The plaintiff's attorney further questioned the VE about the levels of concentration and emotional balance necessary to maintain the job of receptionist. As for concentration, the VE agreed that a person would have to be able to concentrate on what people told her, hear what that said, understand it, and deal with it right away. As for emotional balance, the VE agreed that if a person

became routinely irritated, irritable and/or had crying spells in an observable manner, then the person would not be able to sustain that kind of work. (R. 124-26).

With respect to sit/stand limitations, the plaintiff's attorney asked the VE to assume that the person could only stand for 30 minutes at a time and then had to sit down for at least 10 minutes every hour. The VE testified that if this were the case, then the person could not perform light work in the national economy because sitting is "extremely rare" and then there is a rotation issue. With respect to the ability to grasp with the dominant right hand, the plaintiff's attorney changed the limitation from the ALJ's "slightly reduced ability to grasp with the right hand" to "can only occasionally grasp with their dominant hand." The VE said that the attorney's limitation would eliminate the ability to perform the jobs of receptionist, customer service and information clerk at the light and/or sedentary level (R. 127-28). The VE was not asked by the ALJ or plaintiff's counsel, nor did he offer, any opinions about how plaintiff's aphasia would impact her ability to perform any of the jobs the VE said she could perform give the assumptions in the hypothetical RFCs.

## VI.

The ALJ made the following findings in support of her denial of benefits for the relevant period (*i.e.*, from October 20, 1999 through August 2, 2002).

### A.

The ALJ found that the medical evidence related to plaintiff's physical RFC conflicting. On the one hand, the ALJ did not give "full weight" to the physical RFC opinions of the DDS doctors who opined that claimant could perform most medium level work (*Id.*). However, the ALJ did not say how much weight, if any, she gave them. As discussed *infra*, it appears she rejected these opinions altogether. Her basis for rejection was that "those doctors had no opportunity to treat,

17

examine or even observe" plaintiff, and she found that "the very mild diminished strength in plaintiff's right upper and lower extremity after the stroke precluded her return to such strenuous work" (*Id.*).

On the other hand, the ALJ similarly refused to give "controlling weight" to Dr. Fitzgerald's July 2001 RFC opinion (R. 490-92), which stated that plaintiff could lift less than 10 pounds; could stand or walk a total of less than 2 hours in an 8-hour workday; could sit for a total of 6 hours in an 8-hour workday with rest breaks; could not climb ladders or stoop and had only fair balance. The RFC also stated that, although plaintiff could climb stairs and ramps slowly, she had limited reaching in all directions, as well as limited handling and gross manipulation and fingering and fine manipulation because her right hand arm was "grossly impaired." In addition, Dr. Fitzgerald indicated that plaintiff was limited in her speaking ability due to aphasia; and she had to limit her exposure to hazardous machinery due to her right side weakness in the arm and leg. Again, in rejecting these opinions, the ALJ did not state whether she gave any weight to Dr. Fitzgerald's opinion; but, it is fair to say, based on her ultimate findings, that she rejected Dr. Fitzgerald's opinion because: (1) he did not have any personal contact with plaintiff between April 2000 and October 2001, (R. 21), and (2) the ALJ found a contradiction between Dr. Fitzgerald's April 2000 progress note, which stated that plaintiff had "no . . . CNS problems," and his July 2001 RFC assessment indicating limited abilities to speak. On the later point, the ALJ concluded that "[t]he marked changes in Dr. Fitzgerald's RFC opinion are not explained by the medical or other evidence"(R. 21).

The ALJ also found that the other medical evidence of physical RFC was ambiguous (R. 21). She noted that the focus of the earliest physical RFC findings was on whether plaintiff could return to work as a bus driver. She agreed with the conclusions in those opinions that plaintiff was

18

physically incapable of that work, particularly after the stroke; but, those opinions did not "provide detailed function-by-function RFC opinions" that would enable her to determine whether plaintiff could perform other light or sedentary work. She, therefore, gave them no weight (*Id.*).

With respect to the medical evidence, the ALJ gave significant weight to the mental RFC opinions of the DDS doctors, who opined that plaintiff had a mental RFC to perform and sustain at least simple, repetitive unskilled work throughout the relevant period after her stroke (R. 21). Based on these findings, the ALJ concluded that "there is relatively limited objective medical evidence that claimant suffered from physical or mental impairments that would be expected to impose disabling limitations, and there is significant conflict in the medical evidence, and with claimant's testimony." (R. 24).

Based on this conflict, the ALJ turned to a credibility analysis of plaintiff to support her decision. In a nutshell, the ALJ found that plaintiff was not credible because her claims related to the relevant impairments were not consistent with other medical evidence in the record. Also, the ALJ found evidence indicating that plaintiff did not report her earnings from the union counseling job to the IRS, which she construed as unfavorable to plaintiff regarding credibility. Although a credibility analysis might be appropriate concerning the RFC issue, specifically of whether Dr. Fitzgerald thought plaintiff could return to work after her stroke, here it adds very little to the RFC question: (1) because plaintiff's testimony that Dr. Fitzgerald said she could work would not help her obtain disability benefits and would be considered credible given that it was a statement against self-interest; and (2) because the plaintiff does not specifically challenge the ALJ's credibility findings. Thus, we do not discuss the credibility analysis any further in this opinion.

19

**B.**

Based on the foregoing analysis, the ALJ concluded that the plaintiff had the "RFC to perform and sustain a wide range of light and sedentary work" prior to her 55th birthday (R. 28). Specifically, the ALJ found that plaintiff "could lift, carry, push and/or pull up to 20 pounds occasionally and up to 10 pounds frequently, and she could sit, stand and/or walk throughout a typical workday, with normal breaks." (R. 26). And, although the ALJ found that she "should not do constant repetitive pushing or pulling against resistance with the right upper or lower extremity, and should not climb ladders, ropes or scaffolds or work on moving or unstable surfaces," she found that plaintiff "could climb ramps or stairs occasionally, and could stoop, kneel, crouch or crawl occasionally" (*Id.*). Moreover, although plaintiff "had slightly reduced grip strength in the dominant right hand," she had "normal dexterity." Finally, the ALJ found no evidence that plaintiff was "significantly limited by mental or emotional problems in the ability to perform and sustain simple, repetitive unskilled work prior to her 55[th] birthday." (*Id.*). Based on these limitations and the VE's testimony concerning them, the ALJ concluded that plaintiff could perform light, unskilled work such as housekeeper (8,000 jobs), machine filler/feeder (3,000 jobs), and foot messenger (500 jobs) (*Id.*). The ALJ also found that plaintiff could perform light and/or sedentary semi-skilled jobs such as receptionist (8,000 jobs), customer service worker (5,000 jobs) and information clerk (4,000 jobs) (*Id.*).

**VII.**

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

20

continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2004). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2004). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Young,* 957 F.2d at 389. The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.*

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact which are supported by "substantial evidence," 42 U.S.C. § 405(g) (2004), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron,* 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the

responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

That said, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether

22

the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## A.

We begin our analysis with the ALJ's rejection of the *physical* RFC assessments in the medical record. Plaintiff's lead argument is that the ALJ failed to follow the applicable administrative regulations by not giving controlling weight to the RFC opinion rendered by Dr. Fitzgerald, her treating physician during some of the relevant period (Pl.'s Mem., 8-11) (citing 20 C.F.R. § 404.1527; *Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005) (a treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record)).

Indeed, the ALJ plainly gave little or no weight to Dr. Fitzgerald's RFC assessment, let alone controlling weight. The ALJ stated that she did so because: (1) Dr. Fitzgerald had no personal contact with plaintiff between April 2000 (due to a personal illness) and October 2001; (2) there is inconsistency between Dr. Fitzgerald's July 2001 RFC assessment, which states that plaintiff has "limited" speaking ability due to "aphasia–primarily motor/improved but still obvious" and the April 2000 progress note, which states that plaintiff has "no further CNS problems"; and (3) the "marked changes" in Dr. Fitzgerald's RFC opinion are not explained by the medical or other evidence in the record (R. 21). The plaintiff takes exception to these three bases for rejecting Dr. Fitzgerald's RFC assessment, each of which we consider in turn.

23

**1.**

Plaintiff admits that Dr. Fitzgerald had no personal contact with plaintiff between April 2000 and July 10, 2001, the date of his RFC assessment (Pl.'s Mem. at 8). Plaintiff argues that this is of no moment, since Dr. Fitzgerald "had a longitudinal view of her condition" (*Id.*). Perhaps he did. But, during the period at issue covering 34 months (October 1999-August 2002), Dr. Fitzgerald had no personal contact with plaintiff for eighteen straight months (including the 15 months immediately preceding his July 2001 RFC). In light of this gap during a lengthy period preceding the RFC, we cannot say the ALJ erred in declining to treat Dr. Fitzgerald's RFC as that of a treating physician.[8]

Plaintiff argues that Dr. Fitzgerald's opinion should be considered that of a treater because it is consistent with the progress notes of his colleague, Dr. O'Sullivan, who had taken over the treatment relationship after Dr. Fitzgerald became ill. The Court disagrees. Although a review of the evidence indicates some overlap in the two doctors' observations, there is not complete symmetry. Importantly, Dr. Fitzgerald's RFC assessment indicated that plaintiff had a limited ability to speak given her aphasia, which was "improved but still obvious," there are no progress notes related to plaintiff's aphasia from Dr. O'Sullivan in or near July 2001. Dr. O'Sullivan similarly reported on June 19 and July 17, 2000, that plaintiff continued to have speech problems. However, subsequent visits to Dr. O'Sullivan are silent (or virtually) with regard to speech; instead, those visits focused on respiratory (R. 482) and gynecological (R. 488).

---

[8]Moreover, when Dr. Fitzgerald did treat plaintiff after his illness on October 22, 2001 (R. 521), and continuing in January and May 2002 (R. 520), his notes reflect improvement in plaintiff's speaking ability. That raises a question concerning whether Dr. Fitzgerald's RFC assessment of limited speaking ability, even if valid as of July 2001, applied as of 2002.

With regard to right-side weakness, while Dr. Fitzgerald's RFC assessment stated that she had hemiparesis or weakness in the right arm and leg (R. 491), we find no support for that assessment in Dr. O'Sullivan's notes. The progress notes of plaintiff's June 19 and July 17, 2000 visits to Dr. O'Sullivan are illegible (R. 457). The plaintiff indicates that Dr. O'Sullivan noted decreased muscle power on the right side. But, other than the word "power" in the June 19 entry, the Court cannot read the note. And, other than this note, there do not appear to be any other documented reports by Dr. O'Sullivan about problems with plaintiff's right upper or lower extremity.

Thus, we do not agree with plaintiff's view that the progress notes of Dr. O'Sullivan support the July 10, 2001 RFC assessment by Dr. Fitzgerald. Moreover, we note the July 2000 note by Dr. O'Sullivan said plaintiff could not return to work "in the near future" and it would "be 1 yr. at least" (R. 455). But, plaintiff's inability to return to work for "1 yr. at least" in July 2000, does not support the conclusion that she could not return to work in July 2001 – one year later – without some contemporaneous physical examination. And, neither Dr. O'Sullivan nor Dr. Fitzgerald performed such an examination.

For all of these reasons, we find no error in the ALJ's refusal to treat Dr. Fitzgerald's RFC as that of a treater, or in her refusal to give that RFC controlling right.

**2.**

However, the ALJ went farther, and appears to have given Dr. Fitzgerald's RFC little (and perhaps no) weight. The ALJ's stated reasons for doing so are insufficient to justify that conclusion.

The ALJ found an alleged inconsistency between by Dr. Fitzgerald's April 2000 progress note, which the ALJ characterized as reporting that plaintiff had "no lasting CNS problems" (R. 25),

25

and Dr. Fitzgerald's July 2001 RFC assessment, which states that plaintiff had a limited ability to speak given aphasia which was "improved but still obvious," (R. 491). Plaintiff accurately points out that Dr. Fitzgerald's April 2000 note actually says "no *further* CNS problems" (R. 487). From that accurate observation plaintiff argues that although the ALJ apparently interpreted the words "no further" to mean "no continuing" problems, "no further" could also have meant "no additional" problems (Pl.'s Mem. at 9). Plaintiff is correct that the phrase in Dr. Fitzgerald's report is susceptible of varying interpretations, at least one of which would undermine Dr. Fitzgerald's RFC analysis. However, the ALJ failed to explain how she chose between the different possible interpretations – simply ignoring the word "further" was not the appropriate way to resolve the ambiguity. The ALJ has a duty "to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004). The ALJ's failure to obtain clarification of Dr. Fitzgerald's opinion also provides further support for the Court's view, explained below, that the ALJ needed to seek further medical advice before rejecting this aspect of Dr. Fitzgerald's RFC.

The ALJ also stated that Dr. Fitzgerald's RFC opinion contained "marked changes" from the other medical evidence. Other than the "CNS" ambiguity, the ALJ does not explain the basis for this view. The controlling case law requires an ALJ to build a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001). Because the ALJ does not link the observation of "marked changes" to the contrary medical evidence, it lacks that logical bridge. We therefore find this basis for rejecting Dr. Fitzgerald's RFC assessment to be without force.

26

**B.**

After rejecting Dr. Fitzgerald's RFC, the ALJ refused to give weight to the DDS doctors' RFC assessments that plaintiff could perform most medium level work, because they "had no opportunity to treat, examine or even observe the claimant" (R. 21). Neither party challenges that aspect of the ALJ's opinion. When she did this, in conjunction with her treatment of Dr. Fitzgerald's RFC, the ALJ eliminated the field of remaining medical evidence on the RFC question.

Eliminating the field of available RFC medical evidence as a basis upon which to rely is not a problem when that evidence is deficient or inconsistent with the bulk of other evidence in the record. But, a problem here is that the ALJ, because she disagreed with all physical RFCs in the record, constructed a "middle ground" and came up with her own *physical* RFC assessment. In fact, she made specific lift, carry, push and or pull findings consistent with the light work requirements (*e.g.*, she could lift 20 pounds occasionally and 10 pounds frequently and could sit stand and walk through a typical workday with normal breaks) without any citation to the record for this finding. Indeed, it is not clear to this Court where the ALJ found any medical evidence to support this finding. Based on the physical RFC the ALJ constructed, she found that plaintiff had the physical ability to perform and sustain "a wide range of light and sedentary work" (R. 28).

The ALJ simply cannot do this. Having rejected the available medical record upon which to base an RFC assessment, the ALJ was then required to call a medical advisor and/or obtain clarification of the record to flesh out what she needed to support her decision. *See DeFrancesco v. Bowen,* 867 F.2d 1040, 1043 (7ᵗʰ Cir. 1989)("[t]he administrative law judge is entitled to give substantial weight to the testimony of a medical advisor even though the advisor has not examined the claimant personally). *See also Barnett v. Barnhart,* 381 F.3d 664, 669 (7ᵗʰ Cir. 2004)(sometimes

additional development may provide support for treating source's medical opinion that otherwise appears to be lacking); *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 2005) (ALJ may not rely on a hunch). By failing to do this and relying instead on her own opinion, she impermissibly "played doctor" – something expressly prohibited by the controlling case law. *See Rohan v. Chater*, 98 F.3d 996, 970 (7th Cir. 1996).

## C.

There are two other issues raised by the plaintiff that also deserve attention here, as well as on remand: plaintiff's speech aphasia and mental condition. We will address the evidence of mental condition first.

There is one Psychiatric Review Technique ("PRT") form and one mental RFC assessment in the record (R. 478-81), and it was completed by the same DDS physician (Dr. Terry Travis). In her written opinion, the ALJ gave "significant weight" to the mental RFC assessment, finding that the opinion that plaintiff "had a mental RFC to perform and sustain at least simple, repetitive unskilled work throughout the period after her stroke" was supported by the record (R. 21). This RFC assessment, however, was inconsistent with the observations Dr. Travis made about plaintiff's mental abilities in the Psychiatric Review Technique form (R. 469-477), issued the same day as the mental RFC assessment (R. 478-480). Inexplicably, Dr. Travis stated in the RFC that plaintiff was able to "focus her attention" in written remarks (R. 480), but marked in the PRT form that plaintiff "often" had "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere) (R. 476), resulting in even more inexplicable summary conclusions in the RFC that plaintiff was "not significantly limited" in the "sustained

concentration and persistence" categories (R. 478). On remand, the ALJ must sort out whether (and, if so, why) Dr. Travis's RFC was entitled to significant weight despite those inconsistencies.

The ALJ also must address (and perhaps take additional evidence on) the effect of plaintiff's mental capacity on her ability to work during the relevant period of time.[9] For example, on cross-examination of the vocational expert, the plaintiff's counsel elicited testimony from the vocational expert on the issue of whether plaintiff's noted inability to concentrate and adhere to a schedule would preclude work. Not surprisingly, the VE said that it would (R. 123-24). In fact, he said that if a person had even a "moderate limitation" adhering to a schedule or concentrating or understanding or handling instructions, then she would be precluded from work (*Id.*). The ALJ's failure to address this issue in her opinion raises a red flag that, at a minimum, needs to be acknowledged on remand and then lowered if the Commissioner continues to deny Title II benefits for the relevant period. *See Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568860, at *9 (N.D. Ill., Dec. 7, 2001)(finding that "the fundamental problem with the ALJ's determination is that both in the body of her ruling and in her findings, she addressed the vocational expert's opinion in response to only one of the hypotheticals . . . and disregarded the others"); *see also Connor v. Shalala*, 900 F. Supp. 944, 1003-04 (N.D. Ill. 1995) (holding that the ALJ did not consider the vocational expert's testimony on cross-examination and failed to articulate a basis for rejecting this evidence, which was a basis for remand).

Turning to the speech aphasia issue, the Court also finds it significant that the ALJ did not ask the VE about whether and to what extent plaintiff's speech aphasia would have affected her RFC

---

[9]This would include some comment regarding the diagnosis of dementia given to plaintiff by Dr. O'Donnell, the consultative psychiatrist who issued a report in April 2000 (R. 453).

29

during the *relevant* time, *i.e.,* October 20, 1999 through August 2, 2002. The medical records clearly show that plaintiff's ability to speak was impaired during the relevant time. For example, Dr. Velis reported that she could only provide a one-syllable response to most questions in March 2000 (R. 442); and, Dr. Fitzgerald opined that plaintiff's aphasia was "improved but still obvious" in July 2001 and checked the "limited" box for speaking ability on his RFC assessment (R. 491). The DDS doctors, who actually said plaintiff had a physical RFC to do medium work, also check the "limited" box for speaking ability (R. 465).[10]

This evidence should have been presented to the VE for consideration on how it would impact plaintiff's ability to hold at least the *skilled jobs*[11] the VE testified plaintiff could do, given the hypothetical assumption that she had the physical RFC to do work at the sedentary and light levels: namely, receptionist, customer service/complaint clerk and information clerk jobs. In each of those jobs it is apparent that the person performing the job must be able to speak and be understood. For example, the VE testified regarding the job description for a receptionist, stating: "a person [must] sit and receive phone calls with a headset and answer questions and so forth" (R. 125). He further testified that an information clerk must stand "in the lobby of a building to direct people to their destination" (R. 120) – presumably by speaking to them rather than simply pointing. As for "light work" unskilled jobs that the VE testified plaintiff could do, *i.e.,* housekeeper, machine feeders and fillers, and foot messengers (R. 119), it may very well be that those jobs do not

---

[10]Dr. O'Donnell (a psychiatrist) noted anecdotally in April 2000 that plaintiff answered his questions in short, hesitant sentences at first but later became "free flowing and relevant" (R. 451). This arguable conflict in the evidence on the extent of the plaintiff's speech limitation should have been addressed by the ALJ, but was not.

[11]Although the VE explained that plaintiff's prior work as a counselor gave her transferable skills to perform the jobs of receptionist, customer service/complaint clerk, and information clerk (R. 123), that analysis contains an obvious problem: when plaintiff performed counseling work, it was before her stroke when she could speak well; afterwards, as the medical record shows, her speech abilities were more limited.

necessarily require the ability to speak, but there were no questions or answers about this documented limitation, so it is difficult for the Court to make a finding on that point. Moreover, the ALJ's conclusion that plaintiff "had no difficulty communicating . . . during the hearing, in either receptive or expressive language" (R. 25) misses the point entirely. The onset date issue is limited to the period October 20, 1999 through August 2, 2002; thus, the relevant time period for assessing plaintiff's ability to speak was not at the time of the hearing, but during the period under consideration. On remand, this issue should be fleshed out with the other issues we have noted.[12]

### D.

It was the Commission's burden at Step 5 to support the RFC finding with substantial medical evidence in the record to show that the plaintiff is not disabled. *Young v. Sec'y of Health and Human Services,* 957 F.2d 386, 389 (7th Cir. 1992). She failed to carry this burden. The Court must therefore remand and/or reverse based on the failure to make properly supported RFC findings at Step 5.

We remand the current record does not support a finding of disability, despite plaintiff's argument to the contrary (Pl.'s Mem. at 12-13; Pl.'s Reply at 7-8[13]); thus, the Court cannot reverse the Commissioner's denial of benefits outright. *See Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir. 1993) (outright reversal of Commissioner's final decision is warranted only if "the record can yield

---

[12]We note that the plaintiff did not specifically challenge the ALJ's credibility determination (Pl.'s Reply at 8). With respect to that determination, the ALJ's conclusions can be summarized as (1) plaintiff's statements regarding her conditions were inconsistent with the other medical evidence and (2) the plaintiff acted in ways that were inconsistent and/or dishonest (*e.g.*, not reporting her counseling income to the IRS) (R. 24-26). We decline to rule specifically on this issue given the plaintiff's failure to raise specific arguments and objections.

[13]The Commissioner argues that Dr. Fitzgerald's reports give plaintiff a physical RFC to do sedentary work (Def.'s Mem. 11-12). The Court disagrees (see Ex. 490). Although the VE is not asked to specifically define the physical requirements of sedentary work, the plaintiff picks up on this thought and argues in her reply that even if plaintiff had a physical RFC limited to sedentary work, she would still be disabled under the Medical Vocational Rules (Pl.'s Reply at 7-8). The ALJ needs to specifically address this point on remand.

but one supportable conclusion" and there are no unresolved factual issues). Rather, a remand is necessary for the ALJ to determine, based on the available medical evidence, what the plaintiff's physical RFC was prior to August 2, 2002. The ALJ cannot do this alone; rather, she must call a medical advisor to examine the existing medical record and render an opinion on plaintiff's RFC between October 20, 1999 and August 2, 2002. *See DeFrancesco v. Bowen,* 867 F.2d 1040, 1043 (7th Cir. 1989)("[t]he administrative law judge is entitled to give substantial weight to the testimony of a medical advisor even though the advisor has not examined the claimant personally). This advisor can address the issue of plaintiff's physical RFC, and the tension between Dr. Fitzgerald's opinion in July 2001 (R. 490) and the DDS doctor's opinion in May 2000 (R. 461). This advisor can also address the other issues raised in this opinion.

## CONCLUSION

In constructing her own physical RFC determination, the ALJ improperly "played doctor,"and violated the admonition that an ALJ "must refrain from making her own independent medical findings." *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996). The ALJ did not "flesh out" the medical record as it related to the existing RFC assessments and VE's testimony on the issues of plaintiff's mental capacity and limited speaking ability. For example, she failed to ask the VE important questions about plaintiff's documented speaking limitations and abilities to function in a daily work environment during the relevant time frame, and she failed to address and thus ignored in her written opinion the answers the VE gave to plaintiff's counsel during cross-examination related to documented limitations in plaintiff's mental ability to concentrate (among other things) and how that could eliminate plaintiff's ability to work. The ALJ must minimally articulate the basis

for rejecting such significant testimony and medical evidence. It is on these bases that this Court will therefore remand pursuant to Sentence 4, 42 U.S.C. § 405(g).

We close by summarizing what is required on remand. *First*, the ALJ's decision to reject Dr. Fitzgerald's *physical* RFC assessment needs to be fleshed out on remand. In particular, the ALJ needs to call a medical advisor to provide an opinion on what weight (short of the controlling weight due to a treater), if any, Dr. Fitzgerald's RFC assessment is due. The ALJ may also ask the medical advisor to testify regarding the DDS doctors' RFC assessment. *Second*, if the Medical Advisor finds that there was no medical basis in the record to support the RFC assessments in the record, then this advisor must offer testimony that will constitute the basis for an RFC assessment. *Third*, the ALJ must ask the VE how the plaintiff's documented problems with speech aphasia and her mental limitations would affect the plaintiff's ability to work. And, with respect to any inconsistencies in the medical record regarding speech aphasia and mental incapacity, the ALJ must minimally articulate the reasons for choosing one piece of evidence over another, thereby creating the requisite "logical bridge."

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: June 12, 2006

33